# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 25, 2012

## TIMOTHY LYNN DENTON v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Sullivan County**
**No. C57232      R. Jerry Beck, Judge**

_____

**No. E2011-02429-CCA-R3-PC - Filed September 7, 2012**

_____

A Sullivan County jury convicted the Petitioner, Timothy Lynn Denton, of first degree premeditated murder, and the trial court sentenced him to life in the Tennessee Department of Correction. This Court affirmed his conviction on direct appeal. *State v. Timothy Lynn Denton*, No. E2006-02557-CCA-R3-CD, 2008 WL 933200 (Tenn. Crim. App., at Knoxville, Apr. 7, 2008), *perm. app. denied* (Tenn. Oct. 27, 2008). The Petitioner then filed a petition for post-conviction relief, contending that he had received the ineffective assistance of counsel. After a hearing, the post-conviction court dismissed the petition. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because his trial counsel was ineffective by failing to convey to him plea offers and by failing to appeal the trial court's ruling that he was competent to stand trial. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROGER A. PAGE, JJ., joined.

L. Dudley Senter, III, Bristol, Tennessee, for the appellant, Timothy Lynn Denton.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Barry Staubus, District Attorney General, and James F. Goodwin, Assistant District Attorney General for the appellee, State of Tennessee.

## OPINION
### I. Facts
#### A. Direct Appeal

This case arises from the Defendant's shooting of the victim, Belinda Monroe, in 2003. In our opinion on the Petitioner's direct appeal, we summarized some of the evidence against him as follows:

At trial, the following evidence was presented: Kimberly Dugas, the Defendant's half-sister, testified that, in September 2003, she traveled from her home in Florida to Bristol, Tennessee, with her mother, Irma Jean Abbey, to attend a family member's funeral. She said that, on September 23, 2003, she saw the Defendant with Belinda Monroe, the victim, at the funeral home for the first day of the funeral proceedings. The Defendant lived with the victim, who was also his girlfriend. Dugas saw the Defendant at the funeral home again the next day, September 24, 2003, but the victim was not with him. That day, the Defendant was "crying and having trouble walking and sort of . . . couldn't talk to people." After the funeral, Dugas, her mother, and the Defendant met for supper at a restaurant. The victim did not come because she was home mowing the lawn. After eating, the Defendant returned home to the victim with half of the food he ordered at the restaurant, which he planned to give to her.

Later that evening, Dugas returned to the hotel with her mother. Dugas heard her mother's cell phone ring, and when her mother answered it, she began screaming, "No, Timmy, No," into the phone. Dugas then grabbed the phone, and the Defendant told her he shot the victim and threatened to shoot himself if she called the police. Dugas suddenly lost the connection with the Defendant; Meanwhile, Abbey called 9-1-1 on another phone and reported the shooting.

On cross-examination, Dugas described the Defendant as having "a really hard time with [funerals]" but admitted she had not seen him at any other funerals. However, she said that while they ate supper, the Defendant seemed "fine," and she agreed that he did not "appear to be angry about anything that would have to do with [the victim]." Dugas said the Defendant began crying when he left the restaurant because she and Abbey were returning to Florida. She said that the Defendant's call later that night was brief and consisted of him admitting, "I shot [the victim]." On redirect examination, Dugas said the Defendant was "crying hysterically" when he called and admitted shooting the victim. She said he sounded scared.

Irma Jean Abbey, the Defendant's mother, testified that she traveled

-2-

from Florida with Dugas, for Abbey's sister's funeral. She saw the Defendant at the funeral home on her first night in Tennessee. At that point, "he was fine," and the victim accompanied him. Abbey said, on the second day of the funeral, the Defendant was "very, very upset, crying." She admitted that the Defendant "was drinking or doing something" at the funeral. The Defendant left the funeral with someone in the early afternoon. She next saw him at the restaurant that evening where "he seemed fine." He told Abbey and Dugas the victim was mowing the lawn. Abbey said she knew the Defendant claimed the victim was a lesbian and that he wrote the victim a note that said, "If you want to be with a lesbian[,] I could be gay. I like women too much." Abbey could not remember whether the Defendant told her about the note or if she read the note herself. After dinner, the Defendant left for home on his own. Later that night, the Defendant called Abbey, exclaiming, "Momma, I shot [the victim]. Momma, please, I'm so scared. I didn't mean to do it." Abbey said she called 9-1-1 after her daughter took the phone from her.

On cross-examination, Abbey admitted that the Defendant "is more emotional than . . . most of the family members would be" at funerals, and she had seen him at other funerals. She said the Defendant never mentioned violence or being displeased with the victim, and she never heard the Defendant threaten the victim.

Dale Clifton Haga, the Defendant's uncle, testified that he talked to the Defendant at the funeral. The Defendant was scheduled as a pallbearer, but Haga thought the Defendant "had a little too much to drink" and did not want him carrying the casket. Haga said the Defendant did not smell of alcohol, but his speech was slurred. Haga was one of the first people to arrive at the Defendant's house after the Defendant called his mother and told her he shot the victim. Haga tried opening the front door, but it was bolted shut. As he was attempting to enter the house, he "heard [a] shot." He eventually entered the house through the garage door. Haga testified that he searched the house and "found [the Defendant] laying at the bottom of the bed backwards across it. And he was a-jumping. And I walked up and spoke [the victim's] name. And I looked up and it-I knew it was over then." Haga did not realize the Defendant also shot himself, but he did see a gun by the Defendant's right shoulder. At that point, Haga moved the gun away from the Defendant. Haga said he kept all other people out of the room until the police arrived on the scene.

On cross examination, Haga said that when he entered the bedroom, he

initially yelled out "What the hell have you done, [Defendant]?" because he thought the Defendant was in shock. Upon closer inspection, he realized the Defendant was bleeding from his head.

Dr. Mona Gretel Case Harmon Stephens, a forensic pathologist and medical examiner, performed the autopsy on the victim. She testified that the victim died as a result of a gunshot to the head. The victim had scrapes on the right side of her face and additional abrasions on her face. Such abrasions looked "compatible" with the gun hitting the victim's face because of the "unusual pattern . . . that almost looked like a checkering" on the gun and on the victim's skin. Dr. Stephens said the pattern was especially strong "to the right of the bottom of the eye area." The victim also had contusions on her upper lip and near her left ear. Additionally, the victim had a "star-shaped gunshot wound to the right temple," showing that the barrel of the gun was "tightly against the skin surface" when the gun was fired. On cross-examination, Dr. Stephens said the victim had scrapes deep enough to "where they should have left moisture on the skin." She also said most of the bruises were "small except for the [bruise by the] left ear." That bruise was about two inches in maximum diameter. Dr. Stephens admitted that she did not know if the injuries were caused by a struggle to grab the gun. On redirect examination, Dr. Stephens stated that the injuries the victim sustained were consistent with multiple blows and could be consistent with being "pistol whipped." FN1 Dr. Stephens testified that she did not find any evidence of defensive wounds. On recross examination, Dr. Stephens admitted that the victim's injuries were consistent with a much less "serious series of blows" than that usually connotated by the "pistol whipping."

> FN1. According to Dr. Stephens, "pistol whipping" is when a person uses the gun as an object to hit another person, as opposed to firing the gun. Usually, the beating with the gun is quite severe, often breaking bones. The same term may be used to refer to any beating with a gun.

John Michael Chambers, one of the victim's neighbors, knew the victim for about ten years. He said the Defendant moved in with the victim around 2000. Chambers was watching television with his wife on September 24, 2003, when he heard a gunshot. A few minutes after the shot, he saw police officers coming to the house. Chambers stated that he never saw the couple argue.

Officer Tim Weems of the Sullivan County Sheriff's Office testified that on September 24, 2003, he was dispatched to the victim's house for a reported shooting. Upon arriving at the house, he saw two people laying lengthwise across the bed; the Defendant was still moving, but the victim was not. Officer Weems located a .9 mm gun on top of the dresser and a shell casing near the Defendant's left shoulder.

Detective Landon Bellamy of the Sullivan County Sheriff's Office testified that he responded to a reported shooting on September 24, 2003. By the time he arrived at the scene, the ambulance had transported the Defendant to the hospital, and the victim was declared deceased. Detective Bellamy found the gun used in the shootings on the dresser and placed it into evidence. On cross-examination, Detective Bellamy said his team later found a second shell casing inside a dresser drawer. Detective Bellamy also found one of the bullets fired from the gun "in the wall on the back side of the house." He said the other bullet traveled down into the foundation, and he could not retrieve it. The hospital also recovered a bullet fragment from the Defendant's head. Detective Bellamy testified that he found a typed letter taped to the bathroom mirror and some notes in the kitchen. FN2 One of the notes read, "She's the best thing in the world. We make a good couple." A second note said, "I love Belinda. I can't live without her, so I have no [indecipherable] to live. I think I fuck up." The third note said "Last thing I want to say to [indecipherable] and Brady. I loved her with all my heart Tim." Detective Bellamy found even more notes written by the Defendant before the shooting in one of the trash cans. They conveyed his desire to live with the victim for the rest of their lives and his uneasiness about their current strife. For example, one note included the line "I still hope we work [it] out and one day get married and grow old together."

FN2. The typed letter was introduced only for identification and not for its content.

Special Agent Forensic Scientist Bradley Everett with the Tennessee Bureau of Investigation ("TBI") testified that he analyzed the blood samples from the crime scene. The blood on a white shirt found on the bed belonged to the victim. He could not ascertain a DNA profile from the blood sample taken from the kitchen.

Special Agent Forensic Scientist Laura Jane Hodge of the TBI testified that she did not find gunshot residue on the victim's hands. The absence of

gunshot residue, however, does not eliminate the possibility that the victim might have fired the gun.

Forensic [S]cientist Don Carman with the TBI testified that he matched the bullets and cartridge cases found in the house to the gun found on the dresser. He stated that the gun requires eight pounds of pressure to pull the trigger and that firing the gun requires completely pulling the trigger. On cross examination, Agent Carman testified that the gun did not have an external safety latch.

*Denton*, 2008 WL 933200, at *1-3. The jury convicted the Defendant of first degree premeditated murder, and the trial court sentenced him to life in the Tennessee Department of Correction. *Id*. at *4.

## B. Post-Conviction Facts

The Petitioner filed a pro se petition for post-conviction relief, which was later amended by appointed counsel. The Petitioner contended that he had received the ineffective assistance of counsel because his trial counsel ("Counsel") had failed to adequately convey to him the State's plea offers and because Counsel had failed to pursue an appeal of the trial court's finding that he was competent to stand trial.

At a hearing on the Petitioner's petition, the parties presented the following evidence: Counsel testified that the Petitioner was hospitalized for a short time period after the shooting in this case. Approximately a week later, he was released from the hospital and transported to jail. Counsel said he was appointed to the Petitioner's case when it was heard before the general sessions court, and he represented the Petitioner during the preliminary hearing.

Counsel recalled that, a few months after the preliminary hearing, the trial court held a hearing to determine whether the Petitioner was competent to stand trial. Counsel recounted that the need for a competency hearing was "obvious" because the Petitioner had shot himself in the head, causing certain impairments. The Petitioner's memory of certain events was not the best, so Counsel said that "early on" it was apparent that he needed to have the Petitioner's competency evaluated.

Counsel said he visited the Petitioner "many" times in jail, and the visits caused Counsel concern about the Petitioner's ability to participate in his own defense. At first, Counsel found the Petitioner's mental state "disorganized," and the Petitioner did not have a "very good recollection" of the events surrounding the shooting. Counsel said the Petitioner was, at times, "delusional." He explained that, at first, the Petitioner thought that

his girlfriend was still alive. Counsel said this issue "later resolved itself a little bit."

Counsel arranged for Tom Schacht and a second psychologist to evaluate the Petitioner. Dr. Schacht testified at the competency hearing that the Petitioner had deficits in his memory. He also wrote a letter to Counsel in which he told Counsel that the Petitioner had suffered an injury that would require "two years" to heal. Counsel noted that the trial was more than two years after the shooting. Dr. Schacht also testified at the competency hearing that the Petitioner was in the bottom 2% for auditory skills. Counsel, however, found that he could have a "normal conversation" with the Petitioner. Counsel said that the biggest issue in his communication with the Petitioner was that the Petitioner had an impaired memory of the events that led to the shooting.

Counsel recalled that, during the competency hearing, the trial judge listened to recorded conversations between the Petitioner and members of the Petitioner's family. The trial court relied on language in those conversations as a basis for finding that the Petitioner was competent to stand trial.

Counsel testified that he mentioned on the record after the competency hearing that he might seek an interlocutory appeal of the trial court's finding that the Petitioner was competent to stand trial. He said that, after he researched the issue, he determined that it was not one that he could pursue by interlocutory appeal. Therefore, he decided not to pursue an interlocutory appeal.

Counsel testified that after the trial court found the Petitioner competent to stand trial, and closer to the trial date, Counsel filed a motion to allow the Petitioner some additional consideration in this case. He explained that he told the trial court that the defense may need to take additional recesses during the trial for the Petitioner's benefit. At trial, however, the witnesses testified in a concise manner, consistent with their previous testimony, so the issue of additional recesses did not arise.

Counsel testified that he did not recall the State's offering "much of a plea" to the Petitioner. He said the issue came up during conversations between him and the State's attorney, but he did not recall the State's making an offer. Counsel agreed that the trial judge stated that he thought the parties should engage in a plea agreement in this case. He noted, however, that in Sullivan County the prosecutors were unlikely to enter into a plea agreement and were more likely to take the case to trial.

Counsel said he appealed the Petitioner's conviction to this Court, asserting that there was no proof of premeditation. He said he did not appeal the trial court's ruling that the Petitioner was competent to stand trial. He noted that the standard was that the State had

proven by a preponderance of the evidence that the Petitioner was competent, and, considering the evidence in the record, he did not think he had viable grounds for appeal.

During cross-examination, Counsel testified that this case involved injuries to the victim in addition to her being shot. He recalled that the medical examiner testified that the victim had abrasions and scrapes and had been struck by the butt of the gun before being shot. Counsel described the trial as fairly "clean" and said his only argument with the State centered around the Petitioner's competence and the jury instruction about the definition of "intentional." Counsel said there was no evidence of premeditation, except for a letter written by the victim. Counsel moved that the letter be excluded, and the trial court granted his motion. Therefore, no direct evidence of premeditation was presented to the jury.

John Michael Chambers testified that he had been neighbors with the Petitioner and the victim for several years before the victim was killed, and he lived behind them the day the victim was killed. He said it appeared that the Petitioner and the victim had a "good" relationship. On the day of the victim's murder, the victim was mowing her grass at around 5:00 p.m., and Chambers saw no indication that the Petitioner and the victim were fighting.

Chambers said he testified at the Petitioner's trial. Chambers summarized much of his trial testimony, which included how he heard the gunshot and, after seeing emergency personnel arrive, attempted to render his assistance. At trial, he also provided the jury a layout of the neighborhood, and the State introduced pictures of the neighborhood through his trial testimony.

The Petitioner testified that he understood that he was in court asking for a new trial. He said that his mental problems "come[] and go[]" but that he was, at the time of the hearing, "doing a lot better." The Petitioner said that it was "hard to remember" much of his competency hearing. He said his only clear memory of the hearing was the trial court's saying, "We need to try to work this thing out." He said he spoke to Counsel about this statement and asked Counsel to see about a plea deal. Counsel, he said, never attempted to negotiate a plea agreement with the State. The Petitioner said that he had been incarcerated for two years, was "scared," and wanted Counsel to negotiate a plea deal. The Petitioner said he did not think he was guilty of the crime for which he was charged but that he would have entered a guilty plea. The Petitioner said that , when he expressed to Counsel his desire to enter a guilty plea, Counsel said "Oh, we're not taking a plea."

The Petitioner described his relationship with the victim as "one of the best relationships he ever had." He said he could not believe that something like "this" ever happened, and he said he discussed this fact with Counsel. He said he told Counsel he remembered screaming, "Belinda, stop it. Stop it." He said he remembered fighting with her

over the gun.

The Petitioner said he did not receive a fair trial and expressed his belief that he is not guilty of the crime for which he was charged.

During cross-examination, the Petitioner testified that the doctor whom Counsel had hired to examine him testified that he was not competent to stand trial because of the brain injury he had suffered. The brain injury, the doctor opined, rendered the Petitioner unable to participate fully in his own defense. The Petitioner agreed that the State presented the testimony of two other doctors, both of whom testified that the Petitioner could assist in his defense despite his brain injury. The Petitioner conceded that the trial court focused on the recorded phone conversations between himself and members of his family, which contained "pretty graphic language." The Petitioner denied any memory of making those telephone calls or calling the prosecutor derogatory names during the conversations.

The Petitioner agreed that there was medical testimony during his trial that the victim had abrasions and scrapes, but he denied that there was a physical altercation between them. He said that "bits and pieces" of that night had returned to him and that he was certain there was no fight.

After hearing the evidence, the post-conviction court denied the Petitioner post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because his trial counsel was ineffective. He asserts first that Counsel was ineffective for failing to convey the State's plea offers to him. He next contends that Counsel was ineffective for failing to appeal the trial court's finding that the Petitioner was competent to stand trial.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the

credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be

highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (internal quotations omitted).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

## A. Plea Offers

The Petitioner contends that Counsel was ineffective for failing to convey the State's plea offers to him. He notes that Counsel testified that he had discussions about plea offers with the State but that he did not convey the substance of those offers to the Petitioner because it was not much of an offer. The Petitioner says he was not privy to the conversations between Counsel and the State, so he cannot convey to the post-conviction court with any specificity the State's offer. The State counters that the Petitioner failed to prove by clear and convincing evidence that the State made any plea offer to settle this case. Therefore, the State asserts, the evidence does not preponderate against the post-conviction court's findings. We agree with the State.

The post-conviction court issued written findings, stating:

> The [P]etitioner alleges that plea offers were conveyed to his original trial attorney and that his attorney did not convey the plea offers to him.
>
> The [P]etitioner testified at the post-conviction hearing that he was not aware that a plea offer had been conveyed to his original counsel.
>
> The original trial counsel testified he was not aware of any plea offers stating that the State believed they had a good case and in such circumstances the [S]tate did not ordinarily plea such cases.
>
> Original defense counsel had no memory of the defendant/petitioner asking him to become involved in an offer from the defendant.
>
> **FINDING:** This issue is without merit.

We conclude that the evidence does not preponderate against the post-conviction court's finding that the Petitioner did not meet his burden of proving that the State made a plea offer and that Counsel failed to convey this offer to him. Counsel testified that he and the State spoke to some extent about negotiating a plea deal but that, in a case like this, the the State was unlikely to settle the case, usually opting to take such cases to trial. Counsel did not recall the State ever making a specific plea offer. The State's attorney at the Petitioner's trial did not testify at the post-conviction hearing. The Petitioner testified that he did not know of any specific plea offer made by the State. We conclude that the Petitioner has failed to prove by clear and convincing evidence that the State made a plea offer for Counsel to convey to the Petitioner. He is not entitled to relief on this issue.

## B. Competency

The Petitioner next contends that Counsel was ineffective for failing to appeal the trial court's ruling that the Petitioner was competent to stand trial. He asserts that Counsel should have appealed the trial court's ruling based upon Counsel's own observations of him and based upon the expert medical testimony. The State first notes that two medical experts testified that the Petitioner was competent to stand trial. The State contends that Counsel did not appeal this issue because the standard of proof regarding competency is a preponderance of the evidence standard. Considering the evidence from the State's two expert witnesses, the trial court was within its discretion to determine that the evidence preponderated in favor of the Petitioner being competent to stand trial. Therefore, the State asserts that the post-conviction court did not err when it dismissed the Petitioner's petition. We agree with the

State.

The post-conviction court, in its written order, found:

The [P]etitioner says a competency hearing was held pre-jury trial and that [C]ounsel did not pursue the issue on direct appeal.

The [P]etitioner, after he shot and killed his live-[in] girlfriend, shot himself in the head. He was hospitalized and stayed in the hospital about one week. [C]ounsel . . . testified that the [P]etitioner suffered from short term memory loss but during the period of two years, awaiting trial, the [P]etitioner improved.

Pre-jury trial, a competency hearing was granted and Judge Robert Cupp, sitting by interchange, conducted and presided at the competency hearing.

The defense had at the time employed Dr. Tomas Schacht, Phd. (Psychologist) who testified regarding the [P]etitioner's competence.

The [S]tate obtained their own expert psychologist[s], Dr. Sam Craddock, Phd. [a]nd Dr. Rokeya S. Farooque, M.D., forensic psychiatrist and psychiatrist.

At [the] hearing, the defense and state psychologist disagreed and Judge Cupp declined to find that the [P]etitioner was not competent. Finding by a preponderance that the defendant/[P]etitioner was competent to stand trial.

The issue of competence was for Judge Cupp to consider after weighing the testimony offered at the competency hearing.

[C]ounsel made a decision to not pursue the issue of competency any further.

Under the circumstances and after a review of the competency hearing, . . . the Court is of the opinion that [C]ounsel made a valid strategic decision and as a result, this Court cannot make a finding that [C]ounsel was ineffective. This issue is without merit.

Appellate counsel are not constitutionally required to raise every conceivable issue

on appeal. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell v. State*, 904 S.W.2d 594, 596-97 (Tenn. 1995). Indeed, "experienced advocates have long 'emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.'" *Id.* (citing *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993)). The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. *Id.* Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference. *Id.* We should not second-guess such decisions, and every effort must be made to eliminate the distorting effects of hindsight. *Id.* Deference to counsel's tactical choices, however, applies only if such choices are within the range of competence required of attorneys in criminal cases. *Id.*

If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue. *Id.* (citing as example *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. *Id.* Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. *Id.* at 387-88 (citing *United States v. Dixon*, 1 F.3d 1080, 1083 (10th Cir.1993)).

We conclude that the evidence does not preponderate against the post-conviction court's finding that Counsel was not ineffective for failing to appeal the issue of competency. The evidence at the post-conviction hearing proved that Counsel did not appeal the trial court's ruling that the Petitioner was competent to stand trial because he did not believe that this issue had merit. He noted that the standard by which a trial court must determine competency was a preponderance of the evidence standard and that, considering the testimony of the State's experts and the records of the conversations the Petitioner had with family members while he was in jail, he believed the trial court acted within its discretion when it found the Petitioner competent. Reviewing the record, we conclude that the Petitioner's incompetency claim lacked merit. We further conclude that Counsel's performance in this regard was within the range of competence demanded of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. Accordingly, the Petitioner is not entitled to post-conviction relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that

the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief.  The post-conviction court's judgment is, therefore, affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE